May it please the Court, my name is Mike Langton. I represent Laborers Local 169. I'd like to reserve five minutes for rebuttal. At the heart of this case is the issue of whether a principal can be considered to have participated in negotiations by and through its lawful agent. As noted in my opening brief at page 14, this Court has ruled that the common law agency principles apply to parties governed by the National Labor Relations Act. Nevertheless, in this case, the NLRB erred by not respecting the general principles of agency in deciding that the company had not participated in the negotiations. But Counselor, don't we have to also look at the governing statutes to determine whether or not there was participation that would bind the company? Isn't it important what type of relationship there was between the AGC and the construction company? Which company? Go ahead. Okay. Yes, it's very important. And in this case, there's no dispute that Freyner Construction was a party to the Multi-Employer Association prior to July 27, 2004. There's also no dispute that the AGC held its valid proxy prior to that date. Right. I guess my question more specifically is whether or not the fact that – do you agree this was an 8-F employee relationship? In 2004, correct. Right. So does that make a difference in terms of how we determine whether or not the proxy was still in effect? I don't believe so, because under Luderbach, there's a two-part test, as the Court well knows. And the first part of that test is, were they a member of the Multi-Employer Association? The facts in this case establish that since at least 1995, the proxy was in effect. In fact, it was in effect admittedly by the company through July 27. And I think importantly, on December 19, 2003, the AGC, using that proxy, representing Freyner and others, entered into an amendment to the 2002 – or 2000-2005 contract. Well, the question becomes what – on the vote of the withdrawal, whether or not they were bound to participate in the negotiations through AGC. Well, and that's where I think the NLRB erred, Your Honor, is because the parties – this case is unique in that the AGC and the unions agreed that they had an agreement July 21 at 9.45 a.m. The ALJ and the NLRB said, oh, no, you didn't. Usually it's the – one of those two parties come into court and say, and I didn't have an agreement. These two parties testified, and I thought rather credibly, that, yes, there was an agreement on July 21. Everything that occurred after that was ministerial. There were absolutely no negotiations after July 21. There was an exchange of documents back and forth saying, change this comma, whatever the ministerial duties were. Now, the NLRB – Well, but there were – there were – I mean, the negotiations were never formally open. I disagree. I respectfully disagree. At page 159 of the transcript, the ALJ informed the parties specifically – Excerpts of record. What are you talking about on the excerpts of record? Pardon me? What page of the excerpts of record are you referencing? It's on page 159 of the transcript. It's in my reference. Can you give us a citation on the numbers that are in the excerpts of record, please? Okay. I think that we are looking at, let's see, volume – Record. Volume 1. Yes. And then it's – they're not separately numbered. It's – you'll have to look on the upper right-hand. Correct. Is it like R1, R2? It's all – it's just before volume 2. It has a tab, and it's called volume 1. Okay. I see. Okay. So what page in that? Page 159. Okay. So that's in volume 2, right? No, volume 1. Oh, so the pages are not – There was a two-day transcript of volume – Okay. The numbers were consecutive. I must have the wrong one because I don't see a page 159. Is that the same thing? It goes from one page 136 to 159. 136, 159. Oh, it's not in there. Okay. I'm sorry. Which line? Starting on the fourth line – well, actually, let's start with the second line where the judge starts. But I'm going to tell you right now, based on what he said, and if you're not going to have anything to contradict him, Mr. Parker, Mr. Parker being general counsel, I'm going to find that these are negotiations, informal or formal, however you characterize them. Are you going to have anyone contradicting this testimony? Yeah, keep going. Line 10. No, your documents only say they're informal discussions. And are we going to put form over substance, Your Honor? The testimony from all the people that were present at the table was that were there proposals? Yes. Was there a ton of proposals? Yes. Was there modification of the positions? Yes. Those constitute negotiations. It's as if somebody were to call a rose a daisy. It's still a rose because the negotiations all occurred prior to that time. And John McDowell, the executive director of the AGC, testified, and it's submitted in the record as R6, that they were settled at 9.45 a.m. Thereafter, one meeting was held, which would, under any circumstance, be constituted as negotiations. It's no different than satisfying a speech in an agreement and then making sure that it says what the speech says. Let's assume you're right. Don't you have a problem, assuming you're right, don't you have a problem with the second prong? You said there's two prongs here. The second prong requires the employer to come forward and affirmatively demonstrate in some form that it's affirming the ongoing relationship. What evidence is there that the company did that in this case? And that's where I think the board disregarded the agency principles and disregarded the common law principles. The board has previously stated, as a matter of fact, there was a case called Kephart, where it recognized that the employer did not withdraw its authority from the agent to negotiate. But that's different than having to take an affirmative step. No, I respectfully disagree. Inaction is an affirmative step, in your view? No. What we are contending is that if it's true that the AGC held the lawful, valid proxy, which it did, then the issue, I think, for this Court, the legal issue becomes can an agent recommit for the employer? The board has never addressed that issue. You've pointed to page 159 and to the ALJ's statements there. But the ALJ specifically found against you on page 10 said that Frayner removed itself from the multi-employer bargaining unit, effectively demonstrated its intent not to recommit to multi-employer bargaining. And that's because the ALJ determined that July 30th, when the document was signed, was the only date that it was formally opened. And that's not true. That was the date that the parties got together to sign it. But it's not the date that they negotiated. They negotiated between the two contracts. They had four meetings. And on July 21st, they had the fourth meeting. The July 30th date, that's the first link. In fact, my other argument is that who has control of their own negotiations, the NLRB, the ALJ, or the parties? I respectfully submit that it's the parties. They agreed. They had an agreement on July 21st. And as the Court knows, you don't have to have it in writing to be enforceable, even in the case. So what — I have a problem with the test that you've been using. I'll get to that in just a minute. Let's suppose that the two-step test that the ALJ applies here is the correct one. That second step is whether Frayner, by distinct affirmative action recommitted to respondents, intended to be bound by the extension agreement. Now, what do you — what is the distinct affirmative action that Frayner engaged in that indicated that it would be bound by the AGC's renegotiations? And, Your Honor, I understand, and I anticipated this after this argument. Frayner and the judge actually said in — let's see if I can find that. At page 11 of the judge's decision, he writes, Whatever knowledge Michael Pack may have possessed regarding the informal discussions between the AGC and respondent, and notwithstanding how calculating his inaction might have been, the fact remains that Frayner did not participate in any of the informal discussion between AGC and the unit. So to answer your question, the Frayner, i.e. Pack, had knowledge that these were ongoing. My client was very judicious in sending letters dated June 1st and June 14, saying this is what's going to happen. Counsel, the judge went on to say, Mere inaction is not sufficient to show that the ADAP employer has reaffirmed its intention to be bound by the results of multi-employer bargaining. And I agree. That's exactly what it says. So we have this — So why doesn't that be in your case? That's what I'm trying to get to, is that can an agent who has lawful authority recommit? Now, I concede Michael Pack, after the first meeting where Fred Currier was told about what was going on, and when Michael Pack admitted that somebody in his company got this letter, he said don't go. But he never withdrew the proxy. But how is that an affirmative — how is that an affirmative act that gets AGC to continue the agency? And that's what I'm trying to get to, Your Honor, is that can a principal authorize an agent to act for him in collective bargaining and then not be bound by the principal's act? You don't have an affirmative act indicating that the trainer was going to be bound by AGC's negotiations. You're looking for an affirmative act, not a negative act. That is not a failure to do something. Is it? Or is it knowledge that goes on? So if what you're going to rule is that a principal can do nothing and not be bound by the agent, then I think you're disregarding the agency principles, because it's not as if he was in another country and didn't know what was going on. Can the principal, by agreeing — Counselor, it sounds like you just want to challenge the basis for Lutterbach. No, actually I don't. I don't like the case. Then we're looking at — But I don't challenge the basis because it has two parts. But the part that I think has never been answered by the NLRB, and I've tried to do some research, so this may be a case of first impression, is can a principal be bound, i.e., recommit, because they agree. They shook hands and said, we have an agreement. That's a recommitment to be bound by the negotiations that we just had. Or can the principal say, uh-oh, no, no, no. Now he knows the terms of the agreement. This is just like the Kepler-Pumkin case. Now it's been recommitted by his agent. So in the legal question, I think, before the court stands the principle, simply do nothing, knowing that his agent is doing something, and then say, I'm not acting. Counselor, in my view, this looks like this is only part of your problem, because the board itself, the ALJ is not terribly careful here. The ALJ took the two-member plurality of the Stevens-Cohen opinion, which has only represented two of the five members of the commission or the board. But the board itself was quite careful in its footnotes to state that it had to abide not only by the Stevens-Cohen position, but also by Chairman Gould's position. So do you have any evidence that there was some representation by AGC as to who they represented? As I indicated earlier, on December 13th, 2003, there was no doubt that they represented Frehner because they held the proxy at that time. These parties have had an ongoing relationship for over 20 years, and they never told my client that they did not represent. They never told me before. All of these are negatives, aren't they? Well, never told your client that they did not. That's a negative. I respectfully disagree because there's a course of conduct in the collective bargaining process here, and it has always been if you don't have the proxy, you tell them. And so now my client's going to be faced in the conundrum of before he enters into any negotiation on any time to say, Ken, bring your client. We're not going to honor proxies anymore. Bring them here so that they will be permitted. It may be useful in the future, if you're looking at the Gould opinion, to go to AGC and say, all right, we've got to be very careful. Who do you represent now so we know whether we have to conduct separate negotiations with other construction companies? I'm about out of time. I'd like to direct the Court's attention to footnote 8 in Ludebrecht and also to footnote 13 in Ludebrecht. In footnote 8, it says, Our concurring colleague asserts that the association can take action to bind the employer. However, whereas here, this is in the Ludebrecht case, the employer has not renewed the agency's relationship between itself and the association. The association does not have the power to bind. In my case, in our case, they did have the power to bind. That's in footnote 8. The obvious inference is that the board will recognize that if they did have that power to bind, that indeed they would hold them as recommitted. In footnote 13, they say, and this is quoting from the Customs and Colors contract, The manifestation of an unequivocal intention to be bound requires something less, however, than a solemnly executed document signed and sealed with hot wax. A commitment to bargain on a multi-employer basis will not be made to depend on the presence of a formal associational structure among the bargain participants or the formal delegation of authority from the individual employer to the multi-employer group, nor will the board, faced with the outward manifestations of intent to engage in group bargain, consider as controlling an employer's private manifestation of intent. We understand that. Counsel, I just wanted to ask you, was the Kephart decision cited in your brief? No, unfortunately it was not, Your Honor. But it was in the Luderbeck case, and I did not. All right. You have exceeded your time. We'll give you a minute for rebuttal. Thank you. May it please the Court. My name is Stephen Goldstein, attorney for the National Labor Relations Board, which is seeking enforcement of its order. The board found that the union violated the act by refusing to bargain with the company for a separate collective bargaining agreement covering just its employees. And since the union defends its refusal to bargain by claiming that the company was first bound to an ADAPT collective bargaining agreement that it negotiated with the Pulse Employer Association, the question before the Court is whether the board reasonably found that the company was not affected by that agreement. Now, from Luderbeck, the board established a new legal rule that holds that an ADAPT employer that is part of an ADAPT collective bargaining agreement between the Pulse Employer Association and the union is not bound by the association's successor agreement to the union unless the employer was part of the Pulse Employer bargaining agreement prior to the dispute and the employer engaged in a distinct affirmative action. Okay. Now, counsel, that is the position of two of the five members of the board in Luderbeck. That position does not seem to command a majority of the board. Well, in Gould, what the – I'm sorry. In Luderbeck, the Gould concurrence says that the multi-employer – he thought that the multi-employer association itself holds the third right. But that's a different – you have what we call a Marx problem, which deals with what do we do when we have a decision from the Supreme Court that doesn't have a majority decision? Well, fortunately here, as I think Your Honor was getting at by his question, fortunately the decision can be upheld because there is no evidence whatsoever that the multi-employer association ever told the company when the discussion started at the end of June, beginning of July, that he was actually negotiating on it. So how do you engraft Judge Gould's position onto the two plurality opinions? I think with respect to the second element, there's got to be some affirmative act by somebody, either the principal, an individual employer, or a multi-employer association that puts the third party on notice that the alleged agent, in this case a multi-employer association, does have authority to bind the principal. And in this case, it's simply lacking. There's no evidence – there's certainly no evidence that the company ever told – in the summer of 2004 that it had authorized the multi-employer association to negotiate a successor agreement for it. There's no evidence that the company ever told the multi-employer association in the summer of 2004 that it wanted it to negotiate a successor agreement. And there's also no evidence that the multi-employer association told the union that the company had authorized it to negotiate. Is there evidence in the record that Frayner had indicated either to AGC or to the union that it had some trouble with the agreement as presently constituted because of the problem with the subcontractors up in Reno? Yes. And who did Frayner indicate the problems to? They had a concern that they were going to get stuck with an agreement they couldn't live with because of a peculiar situation up in the north. Who did they describe that problem to? They certainly discussed it with the union. I'm not sure whether they told the multi-employer association. So the union was on notice that Frayner had some concerns about the way that this agreement might be employed in the north. Yes, but in fairness to the union, if the two-part requirements of Lutterbach were satisfied, then the company would be stuck even if the union knew that the company had some problems. So in fairness to the union, that's not the basis for the board's decision, that the union knew that the company had problems with the current agreement. There's no dispute that the company is bound by the agreement. Right, but it at least suggests that there might have been some reason for the union to have questions, particularly if we're looking at, for example, Gould's position, that is that AGC has to affirmatively represent. There might have been some reason for the union to sort of insist on AGC disclosing who they were representing. Yes, that's fair. That's a fair conclusion. The board here in that opening footnote, before it adopts the ALJ's decision, is actually pretty careful, I think, to pay tribute both to the plurality decision and to the Gould concurrence, isn't it? I think that's fair to say, yes. I mean, in this case, of course, I think it's also fair to say that the company actually went further than it needed to do. I mean, the classic letterbox test is that the employer is entitled to remain absolutely mute. In other words, in the ADAPT context, just because an ADAPT employer has agreed to be bound by a whole series of ADAPT agreements in the past, even though it's agreed to be bound by a series of ADAPT agreements that have been negotiated for it by a multi-employer association, doesn't mean it's agreeing to be bound by the next agreement. And the reason for that is that in the ADAPT context, the union does not enjoy a presumption of majority support once its current collective bargaining agreement expires, and therefore the employer has no obligation whatsoever to bargain for the next agreement. That stands in marked contrast to the situation in the 9A context, where a union does enjoy a presumption of majority support, and therefore an employer does have an obligation to bargain for a successor agreement. In this case, the company didn't just stay mute. It actually affirmatively told both the multi-employer association and the union, a few days before the union and the multi-employer association reopened their collective bargaining agreement on July 30th, that it would not be bound by any successor agreement and that the multi-employer association was not empowered to execute another agreement for it. So this company didn't, I mean, they actually did more than they had to do by affirmatively indicating that it would not be bound by a successor agreement. And again, the union stresses that the company knew that the union meeting with the multi-employer association had the possibility of negotiating a successor agreement. You know, we conceded that and the company conceded that, but mere knowledge and allowing that to continue is not an affirmative act. What do we do with page 159 that counsel referred us to, where it appears that the ALJ thought that these negotiations were formal negotiations rather than informal negotiations? Well, I think what happened here was is that the, during the trial, the document was introduced into evidence whereby the union and the employer characterized, I'm sorry, the union and the multi-employer association characterized their discussions. And they said that these are informal discussions. They don't constitute a formal reopening of the contract. I think the judge's comment on page 159 referred to that evidence. But there's another document in evidence which is signed on July 30th, which actually says when the parties reopened their current collective bargaining agreement. And that was reopened. It wasn't reopened until July 30th. And that's the basis for the judge's statement in the actual decision, when he says that prior to July 30th, the company was no longer with the multi-employer partnership. But a few days before July 30th, the company had told both the union and the multi-employer association. So the MOU, the Memorandum of Agreement on July 30th, actually states that the union agency will formally open the master agreement to make the agreed modifications. Yes. Yes. Did the ALJ find that the negotiations were formal negotiations? Did the ALJ actually enter a finding on that point? No, he did not. In fact, the general counsel in this case's theory of why the union's defense was invalid, was he had argued a theory based on the Marina Concrete Line cases, which is that if the parties called their talks informal discussions rather than negotiations, then even if retail associates and the rule of the 9-H contract applied, the company's not stuck as long as it was brought before the agreement was signed. But Ford expressly said we don't need to pass the Marina Concrete because under Lutterbach, the two-part test has to be satisfied. I was just curious as to whether the ALJ made a ruling on that. I don't think he did, no. Just two other quick things. The company relies on, I'm sorry, the union, excuse me, relies on a case called Chapart, but that predates Lutterbach. The union also expresses that, you know, this alleged agent, the multi-employer association, their participation in the negotiations of the informal discussions is enough to bind the principal, but that flipped agency law on its head. And the alleged agent can't establish the agency relationship on its own. There has to be some word for conduct by the principal to establish the agency relationship. Well, this argument was once the agency relationship is created, it continues until the authority is withdrawn. Right. But then you have to look at what's the basis for the initial grant of agency status. And if you look at the 1995 proxy, which is on page 100 of our excerpts of record, you'll see that it doesn't say that the company appoints the AGC to negotiate a successor agreement to the 2000-2005 agreement. It doesn't say that the company appoints the AGC to even negotiate more than one agreement for it with respect to the laborers' union. And it doesn't even say that the agency relationship will continue in effect until terminated. All it says is that the company appoints the AGC to negotiate a labor agreement for it with respect to the laborers' union. And the company's position throughout this litigation has been consistent, that the proxy was not in effect. To be fair to the union, one company witness did say that he thought the proxy was still in effect in the beginning of July of 2004. But, again, even if that was the case, it wasn't until July 30th that the union and the multi-employer association formally reopened negotiations. And a few days before that, it's been disputed that the company told both the union and the multi-employer association that the multi-employer association was not empowered to do the successor agreement for it. In conclusion, the Board requests support for this report. Thank you. All right. Thank you, counsel. Good morning. Good morning. James Winkler for the NFB on this matter. The one issue I'm going to focus on is the first steps up through the bottom, because that also really sort of triggers the recap of some of this analysis. The issue in this case, I think, is whether there is substantial evidence in the record of the proposal to support the Board's conclusion that the 2000-2005 agreement was formally opened in negotiations on July 30th. And if so, everything else falls to place. And the Board and the judge and the Board made it clear that the agreement was formally opened on July 30th and not before. What is that finding in the record from the ALJ? I know it's in there. I was just looking when you were asking a similar question. The judge does refer to the prior discussions as informal discussions on page 43, the last page of his decision. Right. But you said the ALJ made a specific finding that formal negotiations open on a particular date. So I'm asking where is that finding in the record? I do see a reference in his analysis on page 42 in the bottom of the first column. Rather, upon whether by July 30th, 2004, the Board could take to the contract extension agreement. And the date upon which the funding agency set forth the formal open date. Question. Okay. Now, in my supplemental excerpts, I have had three exhibits and a portion of the transcript. The three exhibits are the general counsel pointing to the July 30th memorandum, which the Court has already heard discussed, where they say the union and agency were formally opening the existing agreement. The transcript testimony on pages 190 to 214 is the direct examination of Marceau as an agency official, who would be giving his witness. And I don't want to put it in the direct examination because it would be giving his witness. Pages 202 and 203 are important. And also pages 211 and 212. On pages 211 and 212, the judge specifically asks, is the general counsel pointing to the date of July 30th? Is that the document formally opening the agreement? And the witness says yes. Also, on pages 202 and 203, the Mark Sullivan proposal, over and over again, discussions under the memorandum of agreement were informal discussions, and they were deliberately intended to be informal discussions. I need to use the example of, if they reached an agreement on the funds of items, they could fly to Nashville and walk away because there was an attempt not to make an instant bond until a formal opening. And, again, the judge then asks on pages 211 and 212 whether or not the general counsel pointed to what such a formal opening suggests. Also, exhibit 22, which is tabbed, general counsel 22, the union letter on July 30th, 12 o'clock, Dr. States. On July 30th, 2004, the Labor Center National Union of Northern America and the Congressional Executive Committee of Northern America all opened the Labor's master agreement. So, you have this testimony, and you see documents saying on July 30th, both when signed by the union and when signed by the AGC. Certainly, there's sufficient evidence on the record to support the board's decision and the judge's decision that matters that the contract was formally opened on July 30th. Therefore, the prior withdrawal of authority in writing to the AGC clearly was prior to the formal reopening. Also, there is a reference in the union's brief that the top two subjects of the AGC, they didn't receive that until after the letter. However, the procedure is that the AGC then sends a notice to the union, and you might have for general counsel 29, is the July 27th letter from the AGC, the executive director, to the union saying, and please be advised that the construction company has revoked their promise to sign the borrowing price of labor before the 1st of July in advance after the AGC gives it back for 10% of the assignments that were made. So, the union had verbal and written notice prior to July 30th. So, the whole thing comes down to, does the board, is the board's decision supported by substantial evidence that the contract was opened on July 30th? All right, thank you, counsel. Rebuttal. Thank you, Senators. If there's no proxy, we're not here. In the proxy, which is DC2, it states, if the agreement is satisfactory to my proxy to sign such labor agreement with the union, I hereby grant my proxy full power and authority back to my debt. Not one person, but two people, the attorney and the president, said that that proxy was valid. To sign a agreement, a labor agreement. And that was a big discussion. Yes, that was signed in 1995. But since that time, they had two full collective bargaining agreements negotiated and multiple, I think it was four. Amendments. Amendments. And like I said previously, as to whether or not the judge made a final finding as to whether or not there was formal discussion or negotiations, on page 42 of the decision in the record, it says that the board focuses not on whether Frank are unequivocally and kindly withdrew from the multi-employee bargaining so as to not be bound by the agreement, but rather upon whether by July 30th, 2004, the effective date of the agreement, of the contract. And it actually goes on. It says, date, date, date. Counsel, we can read the opinion. Do you have anything else in closing? I do. The letter, there was never any notice to the union until, and that's in GC 6, when the testimony from Mr. Daley was that he was informed by telephone that they were going to withdraw. He never said that withdrawal until August 13th, and then it came from the agency regardless of date. So my point, never at any notice whatsoever. All right. Thank you, counsel. Thank you to both counsel. The case that's argued is submitted for decision by the court. This court is in recess until 9 o'clock a.m. tomorrow morning. All rise. This court is adjourned.
judges: Rawlinson, Bybee, Burns